**In the Matter of Sterling R. DECKER, Bankrupt.**

**No. 706 B.**

United States District Court
W. D. Virginia,
Charlottesville Division.

Dec. 7, 1962.

Henry E. Belt, Charlottesville, Va., for petitioner Chamberlain.

Carl E. Hennrich, Charlottesville, Va., for creditor George Gilmer.

MICHIE, District Judge.

Bernard P. Chamberlain has filed a Petition for Review of the order of the Referee entered herein May 17, 1962

which, in effect, held that the Bankrupt was entitled to a credit of $5,000.00 on a $5,000.00 bond of the Bankrupt payable to Chamberlain—so that, in effect, nothing is due Chamberlain on that bond.

It appears that by contract dated June 13, 1956 Chamberlain gave Decker an option to purchase for $30,000.00 seven .acres of the western part of Chamberlain's property known as Midmont, as .shown on a plat attached to the option. The option was to expire in two weeks. $100.00 was paid for the option and it was provided that "$100.00 will be due at June 20th to continue this option in force." Apparently this $100.00 was paid and at a later date there was written on the option "This option agreement is hereby extended upon same terms until July 12, 1956, at noon upon payment of $500.00 on same terms" Signed "Bernard P. Chamberlain". The original option was signed by Chamberlain and Decker but not by Mrs. Chamberlain. It was provided that $12,000.00 of the purchase money would be paid in cash and the balance on or before five years after date; and also that "No more than 11 dwellings (single or duplex apartment) shall be erected in the development."

No method of exercising the option was prescribed nor any method of extending the option except the requirement that $100.00 would be due to continue the option after June 20th to its stipulated date of termination on June 27th. However, as above noted, an extension to July 12, 1956 was written on the option and signed by Chamberlain at a later date. And Chamberlain testified that it was his understanding that by mutual agreement the option was extended from time to time thereafter and was at some time exercised—presumably verbally as he testified that he could find no written exercise of the option. At any rate the transaction was not finally closed until January 1957.

The testimony of the parties is very vague as to the situation that existed between the time the option on its face would have expired and the time the deed was actually delivered and the transaction closed. Chamberlain testified that he considered that the option had been exercised and felt bound by it. On the other hand, though Decker testified that the option was extended and was exercised, he seemed also to take the position that there was no binding contract prior to the closing of the transaction. At one point in his testimony he stated that he hoped Chamberlain considered that he still had an option during this period and at another time that he hoped that Chamberlain would not cancel the option. He also said the option was never terminated nor was it ever exercised unless the closing of the transaction constituted an exercise of it. And whether or not it was extended or exercised, certainly Mrs. Chamberlain, who had never signed it, was never bound to convey her contingent right of dower until she actually did so by her execution and the delivery of the deed.

Why was the closing so long delayed when apparently both parties wanted to go through with the transaction? The answer appears to be that after Decker acquired the option, and perhaps did some little work figuring on a development, he decided that he needed to get a further right-of-way through lands of the University of Virginia which adjoined Midmont, thus changing the location of what is known as "Old Mountain Road", and he also wished to develop the property by placing more than eleven dwellings on it.

While the testimony does not directly state as much, I would assume from it that Decker at some point told Chamberlain that he would exercise the option provided a new deed from the University could be secured permitting the making of the changes in the roads and also provided (as the ultimate deed did provide) that Chamberlain would consent to the construction on the property of fifteen single or double family residences, plus a multi-family apartment house.

Chamberlain is an influential alumnus of the University and is well-acquainted with most, if not all, of the Board of Visitors of the University and with the

officials of the University who would make recommendations to the Board. Chamberlain therefore undertook to help Decker get this modification of the road situation from the University. The Board of Visitors however did not meet until sometime in December and hence the deal could not be closed before that time. The Board did meet however in early December and adopted a resolution authorizing the granting of a deed modifying the original settlement with Chamberlain in the manner desired by Chamberlain and Decker.

The papers for the Chamberlain-Decker transaction were actually drawn and dated December 10th, which I believe was the date of the meeting of the Board of Visitors, but the transaction was not actually closed until January 2nd. There is evidence that the deed from the University modifying the previous arrangement had to be rewritten once or twice and this may have been the reason for the delay.

On the day of the closing however Dr. Decker told Mr. Chamberlain and Decker's counsel, George Gilmer, that he had gotten some estimates of the cost of the contemplated development—building roads, installing utilities, etc.—and that they greatly exceeded his original estimates. He stated that the estimate was over $20,000.00 and there is testimony to the effect that it was in fact $21,000.00. He told Chamberlain that he was doubtful if, in view of such an expense, the development would pay at the price put on the land by the previous negotiations. He asked Mr. Chamberlain to make an agreement with him to the effect that, to the extent that the cost of development did exceed $20,000.00, Chamberlain would pay half of such excess. He urged that Chamberlain do this, in part at least, because he said that the redevelopment of the roads would be of benefit to certain lots adjacent to Chamberlain's home which Chamberlain still retained, since the road improvement and the utilities to be put in would have to pass the front of those lots. And this was undoubtedly the case though the benefit would not have added a great deal to the value of the lots. But on the other hand Chamberlain, knowing of the $21,000.00 estimate, undoubtedly thought that agreeing to the proposal would not cost him much over $500.00.

Therefore, as a result of this discussion, Chamberlain and, according to his testimony, George Gilmer who was counsel for Decker agreed on a legend which Chamberlain wrote on one of the bonds that had been prepared, which was in the sum of $5,000.00 and which was due on December 10, 1961. This legend was as follows:

"On or before maturity date the obligors shall submit to Bernard P. Chamberlain a detailed statement of the costs of work done and firm estimates for the work remaining to be done in grading, paving, curbing and guttering the Old Mountain Road from the property conveyed the Deckers to McCormick Road and Midmont Lane so as to be acceptable to the State for highway maintenance, including engineering costs and extending City water lines to serve the 15 lots on the land conveyed the obligors. If such cost of work done and estimate of the work required exceeds $20,000.00 then one-half of the excess over $20,000.00 is to be credited on this bond, but in no case shall the credit exceed $5,000.00. Interest shall be adjusted as of the date when such evidence is submitted.

"Given under our hands this *10th* day of *December*, 1956.

s/Bernard P. Chamberlain

Bernard P. Chamberlain

Sterling R. Decker

Mary Jane Decker"

Another argument used by Decker to persuade Chamberlain to agree to this contingent reduction in the price was that his real estate agent's fee would be reduced by 10% of any sum that Chamberlain had to pay on this account. And

an agreement was in fact entered into between Chamberlain and the real estate agent by which $500.00 of the commission (10% of the maximum that Chamberlain could lose as a result of agreeing to Decker's request) was to be held in escrow until the question had been settled as to whether or not Chamberlain would have to pay anything on account of this endorsement. I understand that this portion of the commission is still held in escrow.

Decker never provided Chamberlain with the "detailed statement of the costs of work done and firm estimates for the work remaining to be done" as provided in the endorsement. Several months after the bankruptcy someone did present Chamberlain with an estimate which had been prepared by O. Robbins Randolph, a local engineer, at the expense of George Gilmer, one of Decker's principal creditors.

In the meantime however the project had long since been abandoned by Decker without the work being finished. In fact though Decker went right to work on grading roads on the property he got interested in another development and abandoned work on the Midmont property—doubtless intending to return to it after the work on his other property had been completed. But Decker went into bankruptcy before ever returning to the Midmont project. Consequently the "detailed statement" presented is practically all on an estimate basis.

The estimate presented comes to $34,193.54 though the Randolph employee who prepared the estimate testified that the estimate for the whole job in 1957 was only $21,000.00.

One major reason for the difference in the estimate may be the inclusion of an item of sewerage in the 1962 estimate in the amount of $7,190.40. It plainly is not properly included. The agreement was with respect to costs and estimates for "grading, paving, curbing and guttering the Old Mountain Road * * * including engineering costs and extending city water lines to serve the 15 lots

* * * " It may be that Dr. Decker then had a sewerage extension in mind, though Mr. Chamberlain testified that he understood that septic tanks were to be used in the development—though it is difficult to see how septic tanks could have served the apartment house which came into the picture apparently towards the last. At any rate, Chamberlain never agreed to pay any part of the cost of sewerage.

The sewerage estimate was $7,190.14 plus 8% for engineering, or a total of $7,765.35. Whether anything for sewerage was included in the $21,000.00 1956 estimate does not appear. If it was it certainly tends to discredit the reliability of one or both estimates as certainly the increase of costs generally in the five-year period (if there was any) could not have accounted for an increase from $21,000.00 to $34,193.54, an increase of 62.8+%.

■ As the total 1961 estimate of the cost of the development was $34,193.54 the elimination of the sewerage item reduces the cost with which Chamberlain might be concerned from $34,193.54 to $26,428.19. The credit on the bond, if any, would therefore be $3,214.10.

■ There are other criticisms of the "estimate". The agreement called for "a detailed statement of costs of work done and firm estimates for the work remaining to be done". The estimate as presented states that it "is based on the development work contemplated in 1957, when the sub-division was planned, combined with unit prices paid for similar work in the period from 1957 to the present." There is no "detailed statement of costs of work done" and an estimate of "prices paid for similar work in the period from 1957 to the present" could hardly be said to be "firm estimates for the work remaining to be done." At the most there is no statement of work done and firm estimate of work remaining to be done but merely an estimate of the total cost at prices over a five-year period, which is said to take into considera-

tion the actual cost (not shown) of the work actually done.

Furthermore, is there any "work remaining to be done"? Decker abandoned the project and never returned to it. His Trustee in Bankruptcy has sold the property to the University which will never develop it, at least not in the method contemplated by Decker. So there is no more "work remaining to be done."

■■ The legend, in fact, might be construed as a contract under which Decker undertook to do certain work which had been planned by him with Chamberlain's knowledge and which would benefit Chamberlain's lands to a certain extent. Under this interpretation Decker's failure to do the work was a breach of contract which relieved Chamberlain from the obligation to credit certain costs on the bond. But even if the legend is not construed as a contract requiring Decker to do certain work, it certainly could not be construed as requiring Chamberlain to give the credit merely because the work would have cost that amount if Decker had done it. It was intended at the most to reimburse Decker for costs actually incurred or about to be incurred—not to give him a lower price on the land so that he could resell at a higher profit. The whole thrust of Decker's argument with Chamberlain in behalf of the reduction was on account of the higher costs that he was to incur and the consequent benefit to Chamberlain's retained land. As it turned out he did not incur those costs and Chamberlain did not receive the contemplated benefits to his retained land.

Mr. Chamberlain therefore argues that there was a failure of consideration for the agreement contained in the legend on the bond since he agreed to the reduction, in part at least, because of the benefit that would accrue to his remaining Midmont lots from the construction of the roads. Dr. Decker admits that he used that as an argument with Chamberlain to get him to make the endorsement but at the same time he stresses the fact that he "might not have gone through with the purchase" if the concession had not been made. There is some merit in both of these contentions and I feel that certainly the benefit to Chamberlain would have been nowhere near equal to the diminution in the purchase price of the land, if in fact the diminution was to be what is now claimed—$5,000.00. Nevertheless in view of the considerations previously advanced I do not think we have to decide whether or not, and if so to what extent, Chamberlain was induced to sign the legend by reason of the benefits that would accrue to his land from the roads that it referred to, though it is a fact that to reach the land bought by Decker from Chamberlain the utilities would have had to come through Midmont Lane in front of Chamberlain's remaining property and therefore would have been of benefit to him.

■ But perhaps more serious still is the fact that no estimate was furnished until long after the maturity date of the bond. This gets into the argument of whether "time is of the essence" of the agreement. It was at first not disposed to take this argument too seriously, as usually in modern days time is not of the essence of an agreement. However, it is stated in 12 Am.Jur., p. 861:

" * * * It has been stated, however, that the tendency of modern authority at law as well as in equity is to regard the question as one of construction to be determined by the intent of the parties and to hold that time is not ordinarily of the essence of the contract unless made so by express stipulation or unless there is something connected with the purpose of the contract and the circumstances surrounding it which make it apparent that the parties intended that the contract must be performed at or within the time named * * *."

■ It seems clear that there is in the situation under discussion "something connected with the purpose of the

contract and the circumstances surrounding it which make it apparent that the parties intended that the contract must be performed at or" before the maturity of the bond. Presumably the parties anticipated that whatever amount was due upon the bond would be paid at maturity. But if the "firm estimates" had not been received by the date of maturity of the bond the debtor would not know how much to pay nor, if he failed to pay, would the creditor know how much to sue for—or how much he would have to bid to protect his claim if he directed the Trustees to sell the property at auction. If Chamberlain had on December 10, 1961 directed the Trustees to sell and the Trustees had sold the property promptly thereafter could it be contended on the basis of a "firm estimate" procured three or four months later that Chamberlain should disgorge $5,000.00 of the money that had been paid him? And it is not unusual for creditors whose interest is being paid regularly to permit bonds secured by deeds of trust to run past maturity—sometimes many years past maturity. If Chamberlain had done this, when would the right claimed by the Trustee to file belated "firm estimates" have ceased to exist—not before the statute of limitations ran on the bond?—or, if not then, when if not at the maturity of the bond?

It is also interesting to note that Dr. Decker, or Mr. Gilmer, his principal creditor, for him, continued to pay interest in full on this bond up until and including its due date. Decker testified that he did not claim the credit sooner because he felt that costs would rise and the estimate on the due date would be greater than any estimate that he furnished before the due date. At the due date he was in receivership and had other things to think about doubtless. But perhaps also he realized that he was not entitled to any credit because he had abandoned the project and there was no "work remaining to be done".

One may also question whether or not the document introduced by Mr. Randolph is in fact a "firm estimate". The word "firm" in this connection must mean something more than an estimate. Yet the document introduced was certainly not more than an estimate and perhaps not even that since it was said to be based on "unit prices paid for similar work in the period from 1957 to the present." We do not know whether these were (1) average prices or (2) prices at the beginning of the period or (3) prices at the end of the period or (4) prices selected haphazardly by Mr. Randolph's employee who made the estimate. No evidence as to these points was introduced. But even if the estimate had been one of prices as of a fixed date, say the day before the bond fell due, it may be doubted that an estimate prepared by an employee of an engineer who is not himself a contractor would be such an estimate as is required by the notation on the bond. "Firm" in this connection seems to me to imply something that someone will stand behind—a contractor's estimate offering to do the work for that price, for example—which was undoubtedly in the mind of the parties at the time they made the endorsement, since they certainly had no idea that the project would be abandoned before the maturity date of the bond—and made no provision for any such contingency.

On the whole I am therefore of the opinion that no such estimate as was required by the terms of the endorsement on the bond has been presented, both because the estimate presented came too late and because it was not such an estimate as was required. And needless to say it is now too late to produce another.

It follows from all the foregoing that the decision of the Referee with respect to the credit on the bond must be reversed and the case will be remanded to the Referee for further proceedings in accordance herewith.

An order will be entered accordingly.